Filed 5/1/15  In re Angel K. CA2/5

# **NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re the Matter of Angel K., A Person Coming Under the Juvenile Court Law. | B261734 |
| DAVID W., | (Los Angeles County Super. Ct. No. CK78535) |
| Petitioner, | |
| v. | |
| THE SUPERIOR COURT OF LOS ANGELES COUNTY, | |
| Respondent, | |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES et al., | |
| Real Parties in Interest. | |

ORIGINAL PROCEEDING.  Robert S. Draper, Judge.  Petition denied and order to show cause dismissed.

Law Office of Timothy Martella, Rebecca Harkness and Viator Ozoude for Petitioner.

No appearance for Respondent.

Mark J. Saladino, County Counsel, Dawyn R. Harrison, Assistant County Counsel and Melinda A. Green, Deputy County Counsel, for Real Party in Interest, Los Angeles County Department of Children and Family Services.

Petitioner David W. ("father") seeks review of the juvenile court's January 5, 2015 order denying him reunification services and setting a Welfare and Institutions Code[1] section 366.26 hearing to terminate his parental rights to his nearly three-year-old daughter, Angel K. Father contends that the juvenile court's finding that the Department of Children and Family Services ("DCFS" or the "Department") provided reasonable services to him, and the order not to return Angel to his care, are not supported by substantial evidence. He argues as well that the juvenile court erred in allowing the de facto parents to advocate in favor of terminating his reunification services. We conclude that substantial evidence supports the challenged finding and order, and that the juvenile court did not err in allowing the de facto parents to participate in the dependency proceedings. We therefore deny the petition for writ of mandate.

FACTUAL AND PROCEDURAL BACKGROUND

The following facts are taken from this court's prior opinion in *In re Angel K.,* (February 10, 2015, B254596), which affirmed the juvenile court's denial of father's section 388 petition to remove Angel from her placement with her de facto parents and place her with her paternal aunt, Tracey W.:

"Angel was born five weeks premature [in June] 2012, and tested positive for cocaine at birth. After a week in the neonatal intensive care unit, she was detained by the dependency court and released to foster parents, who have cared for her continuously since she was a week old.

"Father underwent DNA testing and was declared a presumed father on December 12, 2012. The court found jurisdiction over Angel based on allegations against mother, but dismissed drug and alcohol abuse allegations against father. The

_____

[1] Further statutory references are to this code unless otherwise indicated.

2

court ordered that father should receive family reunification services in accordance with a case plan that included regular drug testing and parenting classes. It also ordered that the Department make efforts to assist father with housing. The court granted father visitation and gave the Department discretion to liberalize visitation.

"Father complied with the case plan, testing negative for drugs and attending all required classes. He consistently visited Angel since September 2012, but according to foster parents, he would only hold her for a short period of time and would return her to foster parents for consoling or comforting. As Angel grew older and began walking, foster parents reported father did not interact with her as much. On two separate occasions, father wandered away during a visit with Angel to get food from a homeless outreach program serving food at the park, and he once spent forty minutes of a visit trying to give away shoes he had brought for Angel that were too small. A Department report expressed concern about father's 'mental capability to fully care for [the] child' and explains he does not 'demonstrate the congitive [*sic*] or emotional capacity to meet the child's immediate needs for care and supervision.' Father lives in a bachelor style apartment with a shared bathroom. Because his apartment was inappropriate for a young child, he expressed a desire to have Angel placed with Tracey.

"In March 2013, Tracey told the social worker she would like to have Angel placed with her. She began attending father's visits with Angel in April 2013, but had not scheduled any additional visits by the time of the Department's June 2013 report. A September 2013 declaration by foster father stated that Tracy had never asked about Angel's schedule, needs, likes or dislikes, and had never asked to visit Angel's Head Start school or attend Angel's medical appointments or therapy sessions. When attending father's visits early on, she would hand Angel back to foster parents to be changed or fed.

"On April 30, 2013, the foster parents filed a request for de facto parent status. In their request, they explained that the Department social worker had informed them that Angel would be moved to Tracey's home in about a month, but they were concerned about potential trauma Angel might suffer from the move, the lack of any prior

relationship between Angel and Tracey, and the prospect that a move might interfere with mother's visitation and possible reunification.

"On May 1, 2013, Angel's counsel walked on a request for a do not remove order preventing Angel's removal from foster parents' home until further court order.[] Father's counsel was present, and informed Judge Draper that he had not had an opportunity to consult with father. The court granted the requested do not remove order, and instructed father's counsel 'if you consult with your client and find that they are violently adverse to this result, you have permission to walk it on.' Five days later, father filed a motion for reconsideration, pointing out that father was still receiving reunification services, and changing Angel's placement from foster parents to Tracey (which the do not remove order prevented) was consistent with the relative placement preference identified in section 361.3. Father's motion requested the opportunity to argue the matter in a formal hearing.

"On June 4, 2013, father filed an opposition to the foster parents' request for de facto parent status, arguing that granting de facto status to foster parents would make reunification services pretextual, because foster parents would seek a continued relationship with Angel. Father's opposition pointed out that while foster parents were supportive of reunification, they opposed relative placement even though Tracey's home had been approved by the Department and she was ready and willing to have minor placed with her. Father again pointed out that the do not remove order prevented the Department from changing Angel's placement from foster parents to Tracey.

"At a June 12, 2013 hearing originally scheduled as a six-month review hearing under section 366.21, subdivision (e), the court continued the review hearing and appointed an expert under Evidence Code section 730 to evaluate father's ability to care for Angel, and if father had cognitive issues, to identify services or resources that could assist him in successfully reunifying with his child. Over father's objections, the court granted de facto status to foster parents, but also gave the Department discretion to permit unmonitored and overnight visits with Tracey and to liberalize father's visitation, including permitting Tracey to act as a monitor.

4

"When Angel began weekly overnight visits with Tracey in early July 2013, de facto parents provided baby supplies to Tracey at her request for about three weeks. De facto parents continued cooperating with visitation plans for two months, but on September 9, 2013, they filed a section 388 petition seeking to stop overnight visits with Tracey and end reunification services for father. They argued that the overnight visits had traumatized 16-month-old Angel, who returned from such visits lethargic and resentful. They further argued despite having 16 months to demonstrate the capacity to care for his daughter, father had not progressed beyond monitored visits and there was no evidence he had demonstrated any parenting abilities.

"At a scheduled review hearing[] on September 13, 2013, the court received the Evidence Code section 730 report. Expressing concern about lifting the do not remove order and subjecting Angel to multiple moves, the court ordered the Department to report on its investigation of Tracey as a possible relative placement, and set a briefing schedule for the parties to brief the issue of relative placement. The court set a December 12, 2013 date to conduct a 12-month review hearing and hear de facto parents' section 388 petition.

"At a brief hearing on October 23, 2013, the court received evidence of father's possible Indian heritage and ordered the Department to investigate the information provided by father's counsel. In a November 21, 2013 report addressing the de facto parent's section 388 petition, the Department recommended terminating reunification services for father, noting he cannot adequately care for a toddler, including taking her to routine medical and developmental appointments. In a separate report addressing Angel's placement, the Department included a quote from the expert's report, describing father's challenges: 'His cognitive functions in other areas are consistent with Asperger's Disorder which is a developmental disability. This will make it difficult for him to deal with all the complexities of child rearing.' The Department recommended an adoptive home study on Tracey, but also stated, 'At this time, it is in the best interest of [Angel] to remain placed with the current caregivers [de facto parents] while a home study on [Tracey] is being completed.'

5

"On December 12, 2013, the court denied the section 388 petition filed by de facto parents, ordered overnight visits with Tracey to continue, and ordered the Department to conduct an adoptive home study of Tracey's home.  It ordered the Department to observe how Angel transitions between her de facto parents and Tracey, and indicated it wanted both the social worker and the Evidence Code section 730 expert available to testify about father's difficulties and needed services.  It continued the review hearing to February 6, 2014.

"On January 2, 2014, father filed a section 388 petition seeking to have Angel placed with Tracey.  On February 6, 2014, the Department filed a response to father's section 388 petition, recommending against changing Angel's placement.  The Department's report included reports by the court-appointed special advocate (CASA) and Angel's occupational therapist expressing concern about negative changes in Angel's demeanor during and after visits with Tracey.

"Juvenile Court Referee Sheri Sobel presided over the review hearing on February 6, 2014, which she treated as an 18-month review hearing.  After hearing testimony from the social worker, the Evidence Code section 730 expert, father, mother, and Tracey, the court denied father's section 388 petition, found a substantial risk of detriment barring return to father, and ordered that Angel would remain placed with de facto parents.  Father filed a Notice of Appeal, appealing from the court's findings and orders from September 13, 2013, October 23, 2013, December 12, 2013 and February 6, 2014, specifically identifying the court's denial of his section 388 motion for relative placement and the court's detriment finding."  As noted above, this court affirmed the juvenile court's order denying father's section 388 motion, based on its finding that a change in placement was not in Angel's best interests.  We also affirmed the juvenile court's detriment findings regarding placement of Angel with father.

On May 8, 2014, DCFS filed a Last Minute Information, reporting that the day after the February 6, 2014 review hearing, Tracey informed the Department that she would not allow the court-ordered parent training classes to take place in her home.  Tracey stated that father was "like a virus," that she wanted to "get rid of," that father

6

was "very annoying" and she did not want him in her house. She concluded that the "reality is [father] can't raise the child."

At a May 8, 2014 progress hearing, the juvenile court ordered DCFS to evaluate parent-child interactive therapy ("PCIT")[2] and regional center services. Father was subsequently found not to qualify for the latter services. In addition, because PCIT services are provided to the parent in the home, and Tracey did not want father in her home, these services also were not available to father.

On July 27, 2014, Dr. Lyn Laboriel of the Fetal Alcohol Spectrum Disorders Clinic filed a report regarding Angel, after having met with the child and her de facto parents on four occasions. Dr. Laboriel diagnosed Angel with Fetal Alcohol Spectrum Disorder, which resulted in significant delays in development, particularly speech and language, as well as serious difficulties with sensory processing and self-regulation. Angel remained at very high risk for serious ongoing developmental and behavioral difficulties, and required intensive therapy and sensitive and aware parenting. Dr. Laboriel described the de facto parents as "extraordinary," with "remarkable skill and intuitive sensibilities" in providing security and safety to Angel; she concluded that Angel was thriving with her de facto parents and that the placement should become permanent.

In a CASA report of August 7, 2014, the CASA recommended that family reunification services with father be terminated and for DCFS to initiate an adoptive home study with the de facto parents. In a Status Review Report of the same date, the Department reported that father was in full compliance with his case plan. However, his current living situation was not suitable for children, and he was looking for a new place to live. The DCFS social worker had attempted to locate parent-child interactive therapy pursuant to the court's May 8, 2014 order, but found no agency which could provide

---

2    PCIT is a program designed to help parents who are having difficulty dealing with their children's behavioral issues. An instructor sits behind a two way mirror, communicates with the parent by way of radio, and coaches the parent on how to respond to the child and deal with these issues.

PCIT services to father. Father continued to visit Angel for an hour once a week. Father was described as "appropriate" during visits, but did not demonstrate a nurturing and loving bond with the child. DCFS recommended that reunification services be terminated.

The juvenile court conducted a contested section 366.25 hearing over 10 days between August 7 and December 11, 2014. In the course of this hearing, DCFS reported that Tracey had moved to Atlanta, and father testified that he did not want her to have custody of Angel. Father stated that his cousin, Melissa H., could help him care for Angel. At the time of the September 10, 2014 hearing, father was unemployed but seeking employment. He had lived for the last five years in "one-room person occupancy" housing, where Angel could stay only three days a week. If Angel were returned to him, they would stay with his cousin the remaining four days of the week. However, father later informed DCFS that Melissa H. was no longer an option for assisting him.

On September 10, 2014, Charles Leeb, Ph.D., who had conducted the court-ordered Evidence Code section 730 evaluation of father, testified that, based on his evaluation, father "would be able to meet all [of] what we call instrumental and material needs, which would be – include, but not limited to, providing food appropriately, shelter, bathing, basic transportation, making the assumption that he has a car or is able to make arrangement[s]. He can look after the child's overall safety in bathing, keep the environment safe, make sure that there aren't things that could be in access to a child that could be dangerous, those kinds of things." Dr. Leeb went on to state that people with Asperger's Disorder, such as father, "oftentimes ha[ve] difficulty in reading emotional cues," and thus are deficient when faced with "the complexities of childrearing," that is, "some of the higher level social interactions that can sometimes be required to help and assist a child" meet their complex emotional needs. Dr. Leeb was not able to assess father's level of ability to meet Angel's emotional needs.

Dr. Laboriel testified on October 1, 2014. She noted Angel's serious and significant special needs, and stated that the child should not be cared for by someone

with special needs of his own. Dr. Laboriel praised the de facto parents' skills in helping Angel with her oral expression and managing challenges in interacting with her environment. She noted that children with Fetal Alcohol Syndrome Disorder are more fragile and tend to have more meltdowns than other children; they trigger into tantrums easily and need a parent that can spot the triggers early. Dr. Laboriel had observed the de facto parents help Angel calm down during a temper tantrum. She also testified to the profound bond which Angel had with her de facto parents, and that it would be jarring for the child to change placements, and would impede her progress.

The de facto father, who monitored father's visits with Angel, testified on October 20, 2014, that during visits, father never changed Angel's diapers or clothes, or provided formula or another beverage for her. When father tried to pick Angel up, she cried and resisted his grip. The de facto father also testified that father had attended just one of Angel's medical or therapy appointments, when the de facto parents provided transportation and financial assistance to him. The de facto parents wished to adopt Angel and remain in contact with her biological family.

Also on October 20, 2014, the social worker testified that DCFS referred father to the Fetal Alcohol Syndrome Disorder parenting class in September, but had not observed a visit between father and Angel at Tracey's home because Tracey was not willing to visit with father. Angel had been referred to the C.A.T.C. Clinic for a complete psychological and educational assessment as ordered by the court on February 6, 2014; she was evaluated by the clinic on March 24, 2014. Father had identified another cousin, M.C., and asked the social worker to assess her home, which would take about a week. M.C. had informed the social worker that she was trying to get a bigger residence in case father came to live with her.

At the continued hearing on December 8, 2014, father testified that he was then living with M.C. and her two children, aged 15 and 6, in a one-bedroom apartment in Long Beach. M.C. had passed her live-scan and had no previous DCFS history. She testified that, as a nurse assistant who had cared for children with disabilities in 1999-2001, she was willing to help father with Angel in any way she could. Although she

9

knew about father's custody situation "from the beginning" and had offered her assistance, M.C. had met Angel for the first time approximately a  month earlier.

The juvenile court heard closing arguments on December 10 and 11, 2014.  DCFS, the de facto parents and counsel for the minor all argued that reunification services should be terminated and the matter set for a section 366.25 hearing.  The gist of those arguments was that, although father had complied with his case plan, the professionals who assessed the situation, including Drs. Leeb and Laboriel, concluded that it would not be safe to return Angel to father's care.  Father argued that DCFS had failed to provide adequate reunification services, that father and Angel were clearly bonded, and that Dr. Leeb's testimony established that Angel's return to father's care posed no substantial risk of harm to the child.  The court recessed until January 5, 2015, to issue written findings.

The juvenile court issued a 13 page Statement of Decision.  The court concluded that DCFS had made a diligent search to locate a hand-on parenting program but was unsuccessful.  The court also found that DCFS did an exhaustive search for parent-child interactive therapy or PCIT services for father, but did not believe that such services could assist him.  The court noted that father did not qualify for regional services.

With regard to the "shared custody" arrangement that father suggested be ordered, the juvenile court commented that Angel's paternal aunt Tracey was ultimately unwilling to allow father to live with her; father's cousin Melissa was only briefly interested in assisting father in caring for Angel, and his cousin M.C. "appeared for the first time two and a half years after this proceeding began and has a house that clearly would not meet ASFA."  The evidence consistently demonstrated that father could not parent Angel without assistance.  The court held that removing Angel from her de facto parents at this time would "severely disrupt the formation of any healthy attachment bond and would result in severe detriment to Angel."

The juvenile court found that DCFS had provided reasonable services to father, but there were "no services available that would result in the Court being able to safely return Angel to Father due to the unfortunate convergence of Father's Aspergers Disorder

10

and Angel's special needs."  The court commented that father was not prejudiced by DCFS's earlier failure to provide reasonable services, because it provided father nine additional months of visitation to develop a bond with Angel, and to demonstrate that he could safely parent the child.  The CASA reports presented to the court showed no change in the minimal interaction between father an Angel during visitation.

The juvenile court terminated father's reunification services, and ordered DCFS to initiate an adoption home study.  Father timely filed this petition seeking review of the juvenile court's ruling.  On March 12, 2015, this court issued an order to show cause why the relief prayed for in the petition should not be granted.


## DISCUSSION

1. *Juvenile court's finding that Angel would be at substantial risk in father's care*

Father contends that substantial evidence does not support the juvenile court's finding that Angel would be at substantial risk of harm in father's care.

Section 366.25 provides in pertinent part:  "After considering the relevant and admissible evidence, the court shall order the return of the child to the physical custody of his or her parent or legal guardian unless the court finds, by a preponderance of the evidence, that the return of the child to his or her parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child.  The social worker shall have the burden of establishing that detriment. . . . In making its determination, the court shall review and consider the social worker's report and recommendations and the report and recommendations of any child advocate appointed pursuant to Section 356.5; shall consider the efforts or progress, or both, demonstrated by the parent or legal guardian and the extent to which he or she availed himself or herself of services provided; and shall make appropriate findings pursuant to subdivision (a) of Section 366."  (§ 366.25, subd. (a)(1).)  We review the findings and orders of the juvenile court for substantial evidence.  (*Armando L. v. Superior Court* (1995) 36 Cal.App.4th 549, 557.)  "In the presence of substantial evidence, appellate

11

justices are without the power to reweigh conflicting evidence and alter a dependency court determination." (*Constance K. v. Superior Court* (1998) 61 Cal.App.4th 689, 705.)

As both parties acknowledge, while compliance with the case plan is an important consideration at the review hearing, it is not the sole factor before the court. (*Constance K. v. Superior Court, supra,* 61 Cal.App.4th at p. 704.) The juvenile court must also consider whether a parent has made progress towards eliminating the conditions that lead to the child's out-of-home placement. (*Ibid.*) A court may also consider, "among other things: whether changing custody will be detrimental because severing a positive loving relationship with the foster family will cause serious, long-term emotional harm [citations]; properly supported psychological evaluations which indicate return to a parent would be detrimental to a minor [citations]; whether the natural parent maintains relationships with persons whose presence will be detrimental to the ward [citation]; instability in terms of management of a home (*ibid.*); . . . limited awareness by a parent of the emotional and physical needs of a child [citation]; failure of a minor to have lived with the natural parent for long periods of time [citation]; and the manner in which the parent has conducted himself or herself in relation to a minor in the past. [Citations]." (*Id.* at pp. 704-705.)

Substantial evidence supports the juvenile court's finding. Due to the combination of father's Asperger's Disorder and Angel's special needs, father was not able to parent Angel without assistance. Indeed, father does not claim otherwise. Rather, he argues that the juvenile court should have released Angel to his care on the condition that he live with and receive assistance from M.C. Father likens his situation to that of a "working parent who depends on a live-in nanny, or a teen parent who lives with her parents and has extensive help from her mother, or a parent in a wheelchair who has a live-in aide." The analogy does not hold. Father suffers from cognitive limitations and does not have consistent assistance. During the pendency of this case, father proffered three different relatives whom he maintained would assist him in caring for Angel. As it happened, for one reason or another, none of the three relatives was able to provide the assistance required. Given Angel's special needs, the de facto parents' demonstrated ability to meet

12

those needs, and the emotional harm which Dr. Laboriel testified would result from severing the strong parent-child bond between Angel and the de facto parents, the juvenile court's order to not return Angel to father is fully supported by the record.

2. *Juvenile court's finding that DCFS provided reasonable services to father*

Father contends that there is no substantial evidence to support the juvenile court's finding that DCFS provided reasonable services to father.

The standard of proof for finding reasonable efforts is preponderance of the evidence. (*Katie V. v. Superior Court* (2005) 130 Cal.App.4th 586, 595.) The standard for determining whether the services provided were reasonable is "not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances." (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547; see also *Robin V. v. Superior Court* (1995) 33 Cal.App.4th 1158, 1164, 1166 [reasonableness of agency's reunification efforts are judged according to the circumstances of the case].) The Department must make a good faith effort to develop and implement a family reunification plan. (*In re T.G.* (2010) 188 Cal.App.4th 687, 697.)

Father maintains that DCFS did not "take full advantage of the medical experts to help them tailor services for Father, or fully explore services that could be put in place either in the home or otherwise if Angel were returned, or try to get him on wait lists, or have a social worker on the case who was familiar with the full scope of it." However, after seeking PCIT and regional services for father in compliance with the court's order, DCFS determined that father did not qualify for either service. DCFS enrolled father in a Fetal Alcohol Syndrome Disorders parenting class and provided him with a bus pass; discussed with Dr. Leeb what services would be available to father (Dr. Leeb suggested only "wraparound" services, which were unavailable because father and Angel had not yet reunified); and attempted to arrange hands-on parenting services, but was unsuccessful because father did not qualify for these services on his own, and Tracey

13

refused to allow these services in her home. Father acknowledges that he was ineligible for a number of services (some due to the fact that Angel did not live with him), but cites as unreasonable the Department's failure to put him on a waiting list at Children's Institute. However, at the time the social worker contacted Children's Institute, she had been attempting to arrange PCIT services with multiple agencies for a period of six weeks. Children's Institute reported that the program was full and had a long waiting list on or about July 25, 2014. Given that the section 366.25 hearing was calendared for August 7, 2014, and that the techniques taught through PCIT services are meant to be demonstrated in the child's home, it was not unreasonable for the Department to refrain from adding father's name to this waiting list.

As the juvenile court concluded, father received a significant amount of services over the two and a half years between Angel's detention at birth and the section 366.25 hearing. There is nothing in the record to suggest that extending reunification services past the 24-month date would have resulted in Angel being placed in father's custody, or that extending services were in her best interests. (*D.C.F.S. v. Superior Court* (1997) 60 Cal.App.4th 1088, 1092; *In re Brequia Y.* (1997) 57 Cal.App.4th 1060, 1068.) In sum, we can find no fault with the juvenile court's conclusion that DCFS was diligent in providing services to father.

3. *Juvenile court's ruling allowing de facto parents to participate in hearing*

The de facto father who, with his wife, had been Angel's foster parents since she was first detained at birth, testified at the section 366.25 hearing over father's objection, and the de facto parents' attorney urged the court to terminate reunification services to father. Father contends that the trial court erred in permitting this level of advocacy by the de facto parents.

Our Supreme Court established the right of de facto parents to "appear as parties" in dependency proceedings. (*In re B.G.* (1974) 11 Cal.3d 679, 692-693.) De facto parents have significant procedural rights in dependency proceedings, including the right to be present at hearings, to be represented by retained counsel, and to present evidence and be heard. (Cal. Rules of Court, rule 5.534(e); *In re P.L.* (2005) 134 Cal.App.4th 1357, 1361; see also *In re Patricia L.* (1992) 9 Cal.App.4th 61, 66 ["de facto parent status 'provides a nonbiological parent who has achieved a close and continuing relationship with a child the right to appear *as a party*, to be represented by counsel, and present evidence at dispositional hearings"].) By asserting their procedural rights to appear, participate, and present evidence, de facto parents may "assert and protect their own interest in the companionship, care, custody and management of the child," and "ensure that all legitimate views, evidence, and interests are considered." (*In re Jonique W.* (1994) 26 Cal.App.4th 685, 693.)

Here, over father's objection, the de facto father was called as a witness to rebut father's testimony regarding visitation. In addition, his attorney argued to the court for termination of father's reunification services. Father cites no case holding that it is error for a juvenile court to allow a de facto parent to participate in the dependency proceedings. Rather, he relies on *In re Damion B.* (2011) 202 Cal.App.4th 880, to argue that the juvenile court erred in overruling his objection. In that case, the de facto parents appealed the juvenile court's ruling denying their request to call witnesses at a review hearing in which the mother was seeking return of her children to her care. The appellate court found no error because, while their participation in the proceedings was circumscribed by the court, they nevertheless participated in the proceedings. That holding does not provide authority for father's contention that the juvenile court erred in this case by permitting the de facto parents to present evidence and argument to the court.

In sum, the de facto parents did nothing more than "assert and protect their own

interest in the companionship, care, custody and management of the child," as was their right.  The juvenile court did not err in allowing the de facto parents to participate in the dependency proceedings.

DISPOSITION

The petition for writ of mandate is denied and the order to show cause is dismissed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


GOODMAN, J.*


I concur:



TURNER, P.J.



MOSK, J.

---

\*     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.